Estate of J. B. Williams, Deceased, Tommy J. Williams and Charles J. Williams, Administrators, and Rosa Williams v. Commissioner.
Estate of J. B. Williams v. Commissioner
Docket Nos. 27414, 37690.
United States Tax Court
1953 Tax Ct. Memo LEXIS 173; 12 T.C.M. (CCH) 829; T.C.M. (RIA) 53251; July 15, 1953
*173 1. Held, deficiencies determined by the respondent are barred by statute of limitations in the absence of proof of fraud or the execution of consent agreements extending the period prescribed by the statute of limitations. 2. Held, deficiency and negligence penalty approved for year upon which the statute of limitations was not pleaded. Bruce Gebhardt, Esq., 321 Law Building, Charlotte, N.C., and J. Spencer Bell, Esq., for the petitioners. James R. Harper, Jr., Esq., for the respondent. VAN FOSSAN Memorandum Findigs of Fact and *174 Opinion The respondent determined deficiencies in income and victory tax and additions to the tax against the petitioners, as follows: Docket
50 Per Cent
Year
No.
Deficiency
Penalty
1942
27414
$ 2.383.85
$1,191.93
1943
27414
2,810.48
1,405.24
1944
27414
4,816.39
2,408.20
1945
27414
5,796.64
2,898.32
1946
37690
13,212.81
6,606.41 Pursuant to leave granted at the hearing, the respondent amended his answer to provide for an alternative penalty of 5 per cent under section 293(a), Internal Revenue Code. The issues presented are whether the petitioners failed to report their correct income for tax purposes during the years 1942 through 1946, and if so, whether the petitioners understated their income with fraudulent intent to evade tax. A further question with respect to the application of the statute of limitations is presented if fraud is not found. Findings of Fact The facts stipulated are found accordingly. The petitioners, J. B. Williams, hereinafter called Williams, and Rosa Williams, hereinafter called Rosa, were husband and wife during the years in question and resided in Concord, North Carolina. *175 The returns for the period here involved were filed with the collector of internal revenue for the district of North Carolina. Williams was born in Syria in 1898 and immigrated to the United States in 1912. Upon entering this country, Williams, aged 12, lived with relatives and attended grade school for one year. After that time, he earned his living as an itinerant peddler until he married Rosa in 1919. She was born in Syria in 1896 and had immigrated to the United States in 1908. When she was six years old, Rosa went to Madagascar with her father, a peddler, where she remained four years and received some informal schooling. At the age of ten, she returned to Syria with her father. Upon arriving in this country in 1908 Rosa made her living selling merchandise from door to door. She received no further education. With other members of her family, Rosa opened and operated a store in Salisbury, North Carolina, until her marriage eight years later to Williams. After their marriage, the petitioners opened a shoe shine parlor in Salisbury, North Carolina, which was sold four years later in 1923 for approximately $1,500. Petitioners bought a small restaurant in Spencer, North Carolina, *176 which they operated for three years. After her marriage, Rosa worked in the enterprises and businesses conducted by her and her husband. She blocked hats while her husband conducted the shoe shine part of their original business and in their later retail ventures she engaged herself in the actual operation of the business. Williams purchased a piece of real estate while in Salisbury for which he paid $2,600 in cash. In 1926, the petitioners moved to China Grove, North Carolina, where Williams operated a variety store until 1928, at which time the petitioners moved to Concord, North Carolina, and operated an establishment known as Williams Candy Kitchen. In 1928, the petitioners, together with relatives, purchased property in China Grove and borrowed money from a local building and loan association. The deed of trust on the property was paid and cancelled in November 1932. The property was rented and the rental profits used to pay off the loan. Williams Candy Kitchen was a combination newsstand, tobacco and candy store until 1933, when sale of beer was added to its activities. This enterprise was operated continuously through the subsequent years, including the taxable years in question. *177 During World War II the sale of beer, which had provided the major portion of the income from the store, was restricted. In later years, the petitioners borrowed funds which they repaid. The petitioners had four children: Charles, born in 1920; Taffy, born in 1924; Mary Louise, born in 1926; and Tommy, born in 1930. The petitioners' sons, Charles and Taffy, served in the United States armed services during World War II and the latter was killed in action in 1945. Following the end of the war, merchandise became more readily available and business increased in 1946. Since their marriage, the petitioners made a constant effort to save money but the amounts of such savings were not known by their children nor by others. In 1933, Rosa opened a savings account at the Citizens Bank and Trust Company, Concord, North Carolina. Deposits were made during 1933 and 1934 and on April 25, 1934, the entire balance of over $600 was withdrawn. Further deposits were made to this account in October 1934, and in the following years, until March 1936, when the entire balance of $1,000 was withdrawn. In April 1936, deposits were again made to her account which followed until August 1939, when again *178 the entire balance of over $500 was withdrawn. In October 1939, a deposit of $500 was made and since December 1940 there have been no deposits and no withdrawals in the account. When her son Charles was married in 1942, Rosa gave him $174. Some of Rosa's savings were used by her husband to purchase war bonds and a life insurance policy on his life. The petitioners' home in Concord, North Carolina was purchased for cash. In August 1937, Williams purchased a brick store building and inventory at a total cost of $4,500 paid in cash. In September 1939, Williams purchased a parcel of real property in Concord, North Carolina, for $2,325, payment for which was made by cashier's check purchased at the Concord National Bank. In December 1939, Williams purchased a piece of property in Concord for $990, which was paid in cash. In April 1940, the petitioners acquired a piece of real property in Concord, North Carolina, for $375, which was paid in cash. On the same date, another piece of property in Concord was purchased for $100 in cash. In November 1940, a real estate parcel was acquired by the petitioners for $1,200, which was paid in cash. In November 1941, the petitioners acquired real property *179 in Concord for $400, which was paid in cash. In 1942 or 1943, Williams exchanged $1,200 in old currency, which had not been made by the government since the late 1920s, and he was accustomed to carrying fairly substantial amounts of currency on his person. In 1942, Williams gave his son Charles $6,000 at the time of his son's marriage. This money was retained by the petitioners' daughter-in-law until 1946, when it was used to purchase a home. During the second World War, Williams attended War Bond auctions and purchased bonds. On one or two occasions, the petitioner had supplied bond for friends or tenants to obtain their release from custody. The petitioners were not accused or suspected of participation in black market activities during the war years. The reputation of the family for honesty and integrity in the community was good. In early 1947, Williams employed a certified public accountant to prepare his tax return for 1946 and to assist him in dealing with the problems arising from his returns for the years 1942 through 1945. The accountant used the retail inventory sales method of determining the petitioners' income and he was supplied by the taxpayers with all rent receipt *180 books, invoices, bank statements, canceled checks, ledgers and notebooks that were available. The accountant computed the income from rents and interest and from the invoices supplied determined the sales made by the taxpayers' business. Markups used in the store were employed to determine profits made on beer, fountain items, magazines, candy, fruit and novelties. The accountant used the same method of computing sales as he had used as an auditor of post exchange systems in the United States Army. He assumed that he had all the purchase invoices. Williams had kept some record of sales in "composition books" but the manner and method of keeping these records were unknown to his family. In the summer of 1945, the location of Williams Candy Kitchen was changed and a fire occurred in the new location which destroyed and damaged the records kept there. One "composition book" relating to a period from 1942 through 1943 was all that was salvaged. The accountant approximately substantiated the petitioners' income tax return for 1943 upon the record kept in this book. The sales reported by the taxpayers closely approximate the sales as recomputed by the accountant from the record obtained. *181 Bank deposits made by Williams in 1943 aggregated $11,669 and purchases paid by check amounted to $7,074. He paid for such items as newspapers and magazines which were bought out of town by check and handled the magazine and newspaper phase of his business separately from the rest. During the taxable years in question, the record kept by the taxpayer in the composition book was used as a basis for reporting sales tax to the Department of Revenue, State of North Carolina. These payments were made by check. Comparison of sales as reported for income tax purposes and for sales tax purposes show little variation for 1942 and 1943. In 1944, sales reported on the petitioners' tax return were $9,800, whereas indicated sales from canceled checks to the State Department of Revenue were $18,073. In 1945, sales reflected on tax returns were $11,166.90. Indicated sales for 1945 from canceled checks to the State were $20,826.67. In 1946, canceled checks to the Department of Revenue indicate sales of $29,578. Sales for 1946, as computed by the taxpayers' accountant and reported for tax purposes, were $32,347.58. The petitioners did not file Federal income tax returns, either individual or joint, *182 prior to the calendar year 1940. They filed a joint Federal income tax return for the calendar years 1940 and 1941 in which no tax liability was disclosed for either year. The taxpayers income tax returns for the years 1942 through 1945 were prepared by a bookkeeper who had no particular training in accounting and who was paid $3 to prepare the returns. He did not do any bookkeeping for the taxpayers. No deductions for salaries were taken on the returns for the years 1942 through 1946. One Weddington had been employed in the store during the years in question and was paid a salary depending on how much he worked. In 1942, deduction for telephone expenses of $42 was taken. In subsequent years, similar services amounted to over $200 per year. Deductions for repairs in the amounts of $180 and $15 were taken in 1942 and 1943 and a deduction of $139.50 was taken for insurance in 1942. Water bills were paid on several rental properties but no deductions were taken for this expense for any of the years 1942 through 1945. During these same years, no deductions from income were taken for tax purposes on account of depreciation, supplies, travel or similar expenses. During the war years, Williams *183 traveled to Charlotte, North Carolina, twice a week and Salisbury, North Carolina, once a week partially in connection with his business. In 1945, Williams reported the sale of real estate for $1,800 with a cost basis of $675. Other sales of real estate under a deed of trust or mortgage in 1945 were not reported by the taxpayers. In the computation of income for the years 1942 to 1946, inclusive, respondent determined that the taxpayers' books and records provided an insufficient basis for the computation of income and used the net worth basis for another computation of income for all years. The petitioners' accountant employed a starting cash position of $18,000 for Williams as of December 31, 1941, for purposes of net worth calculation. The original examination of the petitioners' tax affairs was made for the years 1942 through 1945 and the investigation started late in 1946. Williams was questioned as to his receipts, notebooks and other documents and was asked in December 1946 how much cash he had on hand at the beginning of the taxable period. The figures given by Williams were used by the respondent in the determination of the taxpayers' income upon the net worth basis. The *184 respondent determined and used living expenses in the amount of $3,000 per year in the determination of income on the net worth basis. This figure was based partially on the cost of living index. During part of the war years, two of petitioners' sons were in the service and one daughter was away at school at a cost of $500. Williams and Rosa lived and dressed frugally. They were not extravagant with respect to purchasing food and their meals were simple. Rosa maintained a garden and kept cows, goats and chickens. Their house did not have a furnace and was heated by a grate in the fireplace. The family owned and drove two cars. A protest, prepared by the taxpayers' accountant, estimated their living expenses at $1,800 per year. The petitioners' taxable net income for the years 1942 to 1946, inclusive, as disclosed on the returns and as determined by the respondent, are as follows: Net Income
Determined
Disclosed by
Taxable
Year
Return
Net Income
1942
$2,610.46
$11,686.53
1943
2,739.59
12,156.29
1944
3,648.60
16,882.78
1945
3,879.42
18,917.27
1946
8,388.88
35,153.66
The parties agree that the schedule of the petitioners' assets during *185 the years in question was as follows: 12-31-41
12-31-42
12-31-43
12-31-44
12-31-45
12-31-46
Cash in banks
$ 2,076.28
$ 2,461.60
$ 1,671.35
$ 2,568.37
$ 3,273.35
$ 5,227.67
Building and Loan stocks
810.00
1,682.50
2,267.50
2,852.50
1,855.00
2,265.00
U.S. Government bonds at
cost
562.50
3,881.25
8,549.00
14,324.00
25,181.25
25,181.25
Mortgage notes
0.
0.
1,175.00
2,570.00
9,871.00
17,918.40
Inventory
462.40
322.75
1,064.00
1,200.00
752.00
4,865.66
Automobile
1,075.00
1,075.00
1,075.00
1,075.00
1,075.00
1,075.00
Furniture and fixtures
2,753.95
2,753.95
2,846.95
2,851.95
3,161.95
3,281.45
Real estate
13,510.00
15,385.00
16,735.00
21,285.00
19,160.00
29,020.00
Improvements on real
estate
802.00
1,562.00
1,562.00
2,137.00
1,310.00
1,310.00
Investment in single pre-
mium life insurance
policy
7,330.70
The respondent's determination of income on the net worth basis is as follows: 12-31-41
12-31-42
12-31-43
12-31-44
12-31-45
12-31-46
Total Assets (at cost)
$23,779.62
$32,851.54
$42,594.29
$57,637.34
$77,564.87
$108,120.45
Minus Liabilities
Reserve for depreciation
2,806.66
3,192.05
3,603.07
4,055.56
4,204.89
2,457.22
Net Worth
$20,972.96
$29,659.49
$38,991.22
$53,581.78
$73,359.98
$105,633.23
Increase in net worth
$ 8,686.53
$ 9,331.73
$14,590.56
$19,778.20
$ 31,692.91
Add: Estimated living expense
3,000.00
3,000.00
3,000.00
3,000.00
3,000.00
Federal income tax paid
124.56
342.22
335.33
360.75
Total
$11,686.53
$12,456.29
$17,932.78
$23,113.53
Less: Net long-term capital gain at
50%
( 350.00)
(1,214.74)
Insurance and allotments paid
on life of Taffy Williams,
deceased, per protest
( 300.00)
( 700.00)
(2,981.52)
Net taxable income per statutory
notice
$11,686.53
$12,156.29
$16,882.78
$18,917.27
$35,153.66
*186 [Note: Mathematical errors are evidenced in the above computation.] The petitioner agrees with the above schedule of assets except that he seeks the inclusion of an additional asset of cash on hand in the following amounts: $29,000 on December 31, 1941; $31,000 on December 31, 1942; $26,000 on December 31, 1943; $20,000 on December 31, 1944; $17,975 on December 31, 1945; and $6,475 on December 31, 1946. The respondent has agreed to certain changes in the schedule of assets. Petitioners also disagree that their living expenses were $3,000 per year during the taxable period and fixes these expenses at $600 per year. In Docket No. 27414, the petitioner asserts and the answer admits that the notice of deficiency was mailed to the petitioners on or about February 14, 1950, and that the returns were filed by the taxpayers for 1942 on or before March 15, 1943; for 1943, on or before March 15, 1944; for 1944, on or before March 15, 1945; and for the year of 1945, on or before March 15, 1946. The petition asserts error on the part of the respondent in failing to determine that all tax and penalty for 1942, 1943, 1944 and 1945 is barred by the statute of limitations as provided in section 275 of the Internal Revenue Code *187 . The answer declares that the deficiencies in question are due to fraud with intent to evade tax as specified in section 293 (b), Internal Revenue Code, and that the assessment and collection of the deficiencies are not barred by the statute of limitations by reason of the execution of agreements between the parties extending the period of limitations under the provisions of section 276 (b), Internal Revenue Code, to June 30, 1950. The reply denies: "* * * that the statute of limitations for the year 1942 was ever extended by the execution of any agreement. Deny that the agreement under the provisions of Section 276 (b) of the Internal Revenue Code for the year 1943 was of any effect, and allege that it was obtained after the statute of limitations had run. Allege that the statute of limitations for the year 1943 ran out on March 15, 1947 and the agreement was not signed until on or about January 20, 1948, over ten months later. Deny that the agreement under the provisions of Section 276 (b) of the Internal Revenue Code for the years 1944 and 1945 is of any effect, and allege that the agreement *188 for such years was signed through fear that all the taxes claimed to be due would have to be paid if said agreement were not signed." It was agreed between the parties that capital gains for the years before the Court were as follows: In the year 1944, a long-term capital gain of $700. In the year 1945, a long-term capital gain of $2,725, and a short-term capital gain of $350. It was further stipulated that the year 1942 is not open under any consent filed, and that the imposition of any deficiency for that year is dependent upon a proof of fraud. No part of the deficiencies determined for the years 1942 through 1946 were due to fraud with intent to evade tax. The deficiency determined for the year 1946 was due to negligence on the part of the petitioners. Opinion VAN FOSSAN, Judge: Respondent seeks deficiencies and additions to petitioners' tax because of fraud [1] for the years 1942 through 1946. Alternatively, by amended answer, he asserts a 5 per cent addition to the tax for negligence [2] in the event fraud is not proved. As shown in the findings of fact, the petitioners, in Docket No. 27414, pleaded the statute of limitations as a bar to the deficiencies determined *189 for the years 1942 through 1945. [3] The respondent pleaded fraud and the execution of consent agreements as exceptions to the statute of limitations. The respondent, on brief, requests a finding of fact as follows: "The respondent and the petitioners have stipulated that the statutory notices were timely filed for all years in question except 1942. It has been further stipulated that the year 1942 is not open under any consent agreement filed." *190 The references to the record cited by respondent in support of this request for such finding are to a colloquy in the introductory statements of counsel made at the time of hearing. No other references are found with respect to the issue of the statute of limitations in the transcript, exhibits or stipulation. The respondent argues on brief that the parties have stipulated that the statutory notices of deficiency for the taxable years 1943 to 1946, inclusive, were timely filed and that a consent agreement has been filed extending the statutory period for 1943. We find no such stipulation relating to the years 1943 through 1945 nor are we able to find of record any evidence of consent agreements executed for such years. The briefs shed no light on the question. Where the statute of limitations has been pleaded and a prima facie showing of its expiration has been made by the taxpayer, as here, it becomes the respondent's burden to plead and prove any exception. Farmers Feed Co., 10 B.T.A. 1069; Bonwit Teller & Co., 10 B.T.A. 1300. With respect to the years 1942 through 1945, the respondent pleaded the execution of consent agreement extending the statutory *191 period.[4] The parties have stipulated that the taxable year 1942 is not open under any consent agreement and fraud must be proved to sustain the deficiency. No stipulation or proof has been made with regard to consent agreements for the years 1943 through 1945. The opening statement of petitioners' counsel declares that the pleadings show issues relating to the statute of limitations and that counsel for respondent "will shed some light on that." The opening statement of petitioners' counsel cannot be construed as an abandonment of the issues relating to the statute of limitations of all the years involved. The respondent stipulates with respect to only one year, 1942, from which year any question *192 of limitations is removed in the absence of fraud. As to the other years, the respondent does not sustain his burden by inferences to be drawn from the opening statement by counsel. Certainly, no stipulation, such as respondent seeks to rely upon, with regard to the signing of consent agreements for the years 1943 through 1945, was entered into in the colloquy under discussion. The only other possible source for the respondent's reliance is the petitioners' reply to the respondent's answer. There the petitioners deny that the statute of limitations for the year 1943 was extended by a valid consent agreement since the period of limitations ran out prior to the execution of agreement. The reply further states that the agreement for the years 1944 and 1945 was signed through fear that all taxes claimed would have to be paid if an agreement were not signed. These statements, if supported, might be taken as admissions of the existence of some kind of consent agreement. However, except for 1942, we are left without any corroborative evidence or stipulation on the question as to any consent agreement. Where a waiver which is introduced is regular on its face, the burden becomes that of *193 petitioner to affirmatively show its invalidity. Concrete Engineering Co., 19 B.T.A. 212, affd. 58 Fed. (2d) 566. Here, however, we have no waiver to examine and judge. The only references to such waivers are found in the pleadings. Respondent, on whom rested the burden of proof under the posture of the pleadings, has not sustained his burden of proving an exception to the statute of limitations by reason of consent agreements. He must rely upon fraud alone for the years 1942 through 1945 for no other exceptions to the statute of limitations were pleaded. Negligence penalties cannot be imposed for these years since the deficiencies are barred unless fraud is proved. [5]
Docket No. 37690, relating to the year 1946, has no question of the statute of limitations inasmuch as no plea to this effect was made by the petitioner. United Business Corp. of America v. Commissioner, 62 Fed. (2d) 754. *194 When we turn to the issue of fraud relative to the years 1942 through 1945, we find no sufficient basis in the evidence to sustain the respondent's imposition of the fraud penalty. The record discloses that the petitioners failed to keep proper records and that they understated their income during the years in question. Similarly, however, they omitted valid deductions from this income. We are convinced that their failures are but errors of ignorance and negligence by persons unschooled in the rules of keeping business and tax records. This is the type of case where the picture must be painted with a broad brush. The taxpayers immigrated to this country at an early age, received very little education and soon began to earn their living by selling merchandise. They kept records suitable for their own purposes. Although these records were inadequate for tax purposes, no deceit, concealment or distortion is shown. Rather, the record demonstrates merely a lack of knowledge and care. None of the elements of fraudulent intent necessary to sustain the respondent's burden have been disclosed. The imposition of the fraud penalty must be denied in all the years before us. The deficiencies *195 and negligence penalties thereon for the years 1942 through 1945 are barred. Turning to the issues relating to the year 1946 wherein the statute of limitations was not pleaded, we sustain the respondent's determination of deficiency and negligence penalty. The net worth computation of income agreed to in all respects, save those of cash on hand and living expenses, reveals that the taxpayers underestimated their income. The principal reason therefor was the inadequacy of their bookkeeping records. The petitioners, on brief, conceded that Williams' bookkeeping was primitive and that no adequate accounting system had been employed. The accountant engaged early in 1947 was unable to determine 1946 income from the records available and was required to resort to another method of computing directly from invoices and other material made available by the taxpayers. The percentage markup method employed could not provide a satisfactory method of determining business income unless a complete record of purchases and sales was available. The evidence does not reveal that such was the case here. The petitioners' objections to the net worth computation for that year are not well founded. The *196 respondent accepted the statement of Williams as to cash on hand at the beginning of the taxable period and in his determination has given full credit to the assets owned at that time. The testimony of Rosa that substantial amounts of cash were hidden in small boxes in their home was uncorroborated. Their children could not substantiate this testimony. No one saw this money or had knowledge of it. Living expenses were fixed by the respondent at $3,000 per year. The taxpayers, through their accountant, estimated their living expenses at $1,800 annually. The family owned and drove two automobiles during the years before us. The petitioners' family lived simply and attempted to economize as best they could on their living expenses. We are of the opinion, however, that respondent is not shown to be in error in fixing the taxpayers' living expenses at $3,000 per year. The negligence penalty for the year 1946 must be sustained. Although the taxpayers sought competent advice in 1947 in connection with their 1946 return, their failure to keep adequate records precluded an accurate determination of income at that time. Because of the negligence of the taxpayers, disclosure of essential facts *197 was not made. We conclude that the deficiency and negligence penalty for the year 1946 was not erroneous. Decisions will be entered under Rule 50. Footnotes
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612 (d) (2). ↩
2. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272 (i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable. ↩
3. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.↩
4. SEC. 276. SAME - EXCEPTIONS. * * *
(b) Waiver. - Where before the expiration of the time prescribed in section 275↩ for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assesed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.
5. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩